UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ROBERT BLASKO, JR., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 15-cv-30185-MGM |
| | ) | |
| WAYNE DOERPHOLZ, et al., | ) | |
| Defendants. | ) | |
| | ) | |

REPORT AND RECOMMENDATION REGARDING
DEFENDANTS' MOTIONS TO DISMISS
(Dkt. Nos. 10, 18, and 24)

ROBERTSON, U.S.M.J.

I.      Introduction

        Currently before the court are the separate motions of the defendants Wayne Doerpholz,

Andrew Orr, and the Municipal Light Board for the Town of South Hadley (the "Light Board")

to dismiss certain state and federal claims brought against them by the plaintiff, Robert Blasko,

Jr. ("Plaintiff"), in connection with his employment with the remaining defendant, the South

Hadley Electric Light Department ("SHELD") (Dkt. Nos. 10, 18, and 24).  Plaintiff claims

principally that the defendants retaliated against him because he complained outside of SHELD

about Doerpholz's mismanagement of SHELD, including, in particular, Doerpholz's

longstanding tolerance of Orr's harassing, threatening, and, at times, violent workplace

misconduct directed at fellow SHELD employees, including Plaintiff.  Doerpholz and Orr have

moved to dismiss Plaintiff's claims brought under the Massachusetts Civil Rights Act (MCRA)

and 42 U.S.C. § 1983 and for intentional infliction of emotional distress (Dkt. Nos. 18 and 24).

The Light Board has moved to dismiss Plaintiff's claim for negligent supervision, training, and

retention of Doerpholz and Orr (Dkt. No. 10). The motions have been referred to the undersigned for report and recommendation (Dkt. No. 32). The court heard the parties at oral argument. The court recommends that Doerpholz's motion be DENIED; that Orr's motion be GRANTED with respect to Plaintiff's claims under the MCRA and § 1983, but DENIED with respect to Plaintiff's claim for intentional infliction of emotional distress; and that the Light Board's motion be GRANTED.

II.     Facts Alleged in Plaintiff's Complaint

SHELD is a municipal electric plant duly established and organized under the laws of the Commonwealth of Massachusetts to provide electric service to the Town of South Hadley (Dkt. No. 1 at ¶ 7). The Light Board is responsible for maintaining and operating SHELD and was, at all times relevant to this action, comprised of three elected members (*id*. at ¶¶ 8-9, 12 (citing Mass. Gen. Laws ch. 164, § 55)). To fulfill its statutory duty, the Light Board is to appoint a manager, who, under its "direction and control," has the "full charge of the operation and management of the plant," including "the employment of … agents and servants" (*id*. at ¶ 10 (quoting Mass. Gen. Laws. ch. 164, § 56)). At the end of each municipal year and at any time as required by the Light Board, the manager must make a statement to the Light Board "of his doings" and of the business and financial matters in his department (*id*. at 10 (quoting Mass. Gen. Laws ch. 164, § 56)).

Since 1982, Doerpholz served as the manager for SHELD (id. at ¶16). Over the years, Doerpholz operated the plant on a day-to-day basis with the support of approximately twenty personnel, including administrative staff, engineers, and electricians (*id*. at ¶¶ 7, 13). SHELD employed Plaintiff as a customer service and department electrician since 2000 (*id*. at ¶¶ 19-20). For almost the same period of time, SHELD employed Orr as an engineer (*id*. at ¶ 6). In addition

to his duties as an engineer, Orr had some ability to direct the activities of other employees, and Doerpholz held him out as a supervisory figure of some sort (*id*. at ¶ 21).

Approximately half of SHELD's employees, including Plaintiff, are unionized, with their employment relationships governed in part by a collective bargaining agreement between SHELD and the International Brotherhood of Electrical Workers Local Union 455. The agreement requires that SHELD provide an operational system that "will further to the fullest extent possible, the safety of employees" (*id*. at ¶ 15). SHELD's personnel policy manual also guarantees employees the right to work in the "safest conditions possible," and provides that employees may be sanctioned for misconduct, including illegal conduct; failing to abide by prescribed standards of "work, morality or ethics;" using abusive language; engaging in unsuitable personal conduct; displaying "attitudes which constitute an unwholesome influence on other employees;" fighting; interfering with co-workers; and engaging in unsafe behavior (*id*. at 14).

According to Plaintiff, during Doerpholz's lengthy tenure and notwithstanding the statutory construct pursuant to which he is to report to the Light Board, Doerpholz resisted oversight by the Light Board and allocated all authority to himself (*id*. at ¶ 18). The Light Board, for its part, took no action to prevent Doerpholz's usurpation of its authority, thereby failing to fulfill its statutory duty to oversee and direct Doerpholz and allowing Doerpholz to manage and operate SHELD without adequate check or oversight (*id*.). In particular, the Board stood silently by while Doerpholz allowed Orr to verbally and even physically abuse fellow SHELD employees without repercussion. Starting as early as 2002 or 2003 – a decade or more before the first in the series of events giving rise to this lawsuit on December 13, 2013 – Orr intentionally struck at least three co-workers (*id*. at ¶ 22(a), (g), (i)); acted in a physically

3

threatening fashion toward at least two co-workers (*id*. at ¶ 22(d), (k)); and made threatening, offensive, or profane statements to at least seven co-workers (*id*. at ¶ 22(b), (d), (e), (g), (h), (i), (k)). Orr's misconduct was the subject of four union grievances – two in 2003, one in 2004, and one in 2012 (*id*. at ¶ 22(c), (f), (i), (j)). The 2004 grievance complained that Orr persisted in threatening and intimidating numerous co-workers, resulting in an unsafe and unhealthy workplace, and asked that Orr be removed from direct dealings with SHELD employees and that SHELD take action to stop the growing pattern of misconduct (*id*. at ¶ 22(f)). In a December 2004 meeting held to resolve the grievance, the parties reached an agreement in which the Department represented that it took allegations of disrespectful and abusive treatment of employees very seriously and stated that Orr had received a strong reprimand and had been warned that further misconduct would lead to additional discipline (*id*. at ¶ 22(f)). Doerpholz signed the agreement (*id*.). According to the 2012 grievance, despite the earlier agreement that such behavior would stop, Orr continued to abuse employees both physically and verbally (*id*. at 22(j)). The grievance sought Orr's termination and the provision of a safe work environment for SHELD employees (id. at ¶ 22(j)). Orr was not terminated, however, and Doerpholz failed to respond to remedy the situation at any time leading up to the events on December 13, 2013 (*id*. at ¶¶ 22(j), 24).

On December 13, 2013, Plaintiff and Orr were having a discussion about a customer service issue (*id*. at ¶ 26). Immediately following the discussion, Plaintiff left with a piece of paper bearing the contact information for the customer (*id*). Orr followed Plaintiff into an office, took the paper from Plaintiff, and called Plaintiff a "fucking piece of shit" (*id*.) When Plaintiff objected, Orr advanced threateningly on Plaintiff and pressed the piece of paper into Plaintiff's chest (*id*). Plaintiff told Orr not to touch him and to go away. Instead, Orr attempted to lure

Plaintiff into a fight, moving his hand under his chin several times and telling Plaintiff, "Go ahead and hit me" (*id*. at ¶ 27).  When Plaintiff refused, Orr told Plaintiff to come with him up the stairs (*id*.).  Plaintiff told Orr that he was too aggressive and refused to go anywhere with him (*id*.).  That same day, Plaintiff reported the incident with Orr to his union representative and filed a complaint for criminal battery with the South Hadley Police Department (*id*. at ¶ 30).  At the end of the day, when Plaintiff was walking to his vehicle to leave, Orr stared Plaintiff down in an intimidating manner (*id*. at ¶ 31.).

Three days later, on December 16, 2013, Doerpholz asked Plaintiff to explain what had occurred between him and Orr.  Plaintiff described the incident to Doerpholz and told Doerpholz that his anxiety level was high as a result of the incident and the unsafe work environment that Doerpholz had allowed to persist for years (*id*. at ¶ 33).  Doerpholz told Plaintiff to try an anxiety medication that worked for Doerpholz and asked Plaintiff to write out a statement of the event, which Plaintiff did (*id*.).  Doerpholz took no action to address the December 13, 2013 incident or the overall workplace environment, however (*id*. at ¶¶ 33-35).   Plaintiff worked from December 16 through December 20, 2013, the week following the incident, during which time Orr ignored him (*id*. at ¶ 35).  Thereafter, Plaintiff was out of work for prescheduled time off over the holidays (*id*. at ¶ 35).

As his time off drew to an end, Plaintiff's anxiety and stress level increased (*id*.).  On January 2, 2014, Plaintiff's physician wrote a note indicating that Plaintiff was unable to return to work in any capacity and would be reevaluated again in one week (*id*. at ¶ 37).  The note was provided to Doerpholz (*id*.).  Doerpholz and Plaintiff spoke by phone the next day (*id*. at ¶ 38). In response to Doerpholz's inquiry, Plaintiff explained that his anxiety level was too high for him to return to work given the situation with Orr and Doerpholz's failure to do anything to address it

(*id*.).  By this time, Doerpholz knew that Plaintiff had reported the incident to the union and the police, and he told Plaintiff that he was so furious at Plaintiff for taking the matter outside of SHELD that he was shaking and trembling in anger (*id*. at ¶¶ 39, 42).  Doerpholz told Plaintiff that he viewed Plaintiff's doctor's note as "game-playing," and that he considered it to be a "letter of resignation" (*id*. at ¶¶ 43-44).  Doerpholz advised that he would need to speak to his lawyer to determine whether Plaintiff would be entitled to paid sick leave and that the matter might be a worker's compensation situation (*id*. at ¶ 45).  Doerpholz told Plaintiff to update him after Plaintiff's next doctor's appointment on January 9, 2014 (*id*.).

Plaintiff's anxiety level increased even further following the call with Doerpholz (*id*. at ¶ 47).  Plaintiff spoke to his physician by phone and was advised to cease further direct contact with Doerpholz at that time (*id*.).

On January 6, 2014, Doerpholz followed up with Plaintiff by letter (*id*. at ¶ 48).  He advised Plaintiff that if he wanted to be paid while he was out of work, he would need to take paid sick leave or use vacation time and that he was prohibited from any other employment (*id*.).  On January 9, 2014, Plaintiff was reevaluated by his doctor, who wrote another note indicating that Plaintiff remained unable to return to work in any capacity (*id*. at ¶ 51).  Thereafter, for a period of a few months lasting through April 7, 2014, Plaintiff was reevaluated by his physician on a weekly basis, and his physician continued to declare Plaintiff unfit to return to work (*id*. at ¶¶ 52, 60).

On January 22, 2014, a physician designated by SHELD saw Plaintiff for an evaluation and spoke with Plaintiff's physician.  The following day, SHELD's physician concurred with Plaintiff's physician that Plaintiff was unfit to return to work at SHELD at that time (*id*. at ¶¶ 53-54).

On January 24, 2014, Plaintiff gave a union official an envelope containing his most recent physician's note and a request from Plaintiff for Family and Medical Leave Act ("FMLA") material to deliver to Doerpholz (*id*. at ¶ 55).  Doerpholz refused to take any paperwork that had to do with Plaintiff (*id*. at ¶ 55).  Consequently, on January 31, 2014, Plaintiff sent the documents to Doerpholz by registered mail (*id*.).

Several times during the month of January, Doerpholz walked by Plaintiff's home and noticed that the vehicles on Plaintiff's property had been rearranged (*id*. at ¶ 92).  This led Doerpholz to suspect that Plaintiff was working elsewhere while on leave from SHELD, and Doerpholz used public funds to hire a private investigator to follow Plaintiff for a period of time in early 2014 (*id*. at ¶¶ 92-93).  On one occasion in March 2014, an unlicensed individual who worked for the private investigator followed Plaintiff from his home to another residence, entered the residence without the owner's permission,[1] and surreptitiously recorded Plaintiff wearing a tool belt and taking down a bracket with a drill (*id*. at ¶¶ 93-96).  Doerpholz considered this evidence that Plaintiff was violating the no-work rule Doerpholz had imposed, but, in fact, Plaintiff was assisting a friend who was doing work at the property, something which Plaintiff had done on a number of occasions for this friend with no expectation of compensation and without being employed by this friend (*id*. at ¶ 97).  According to Plaintiff, his healthcare providers had encouraged him to get out of the house and keep himself busy to improve his physical condition, and he was heeding their advice at the time (*id*. at ¶¶ 83, 97).

On April 4, 2014, Doerpholz sent Plaintiff a letter advising Plaintiff that his FMLA leave had "expired" on March 28, 2014, and it was "expected that [he would] return to work promptly

---

[1] According to the complaint, while the investigator testified that a male who identified himself as the owner admitted her into the residence based on a lie she told that she needed to look for a lost dog, the owner was not home and could not have given her such permission (*id*. at 94-95).

upon receipt of this letter" (*id.* at ¶ 57).  When Plaintiff's union representative spoke to

Doerpholz about the letter, Doerpholz stated that, despite the wording of the letter, what he

wanted was an updated note on Plaintiff's status (*id.* at ¶¶ 61).  On April 7, 2014, Plaintiff

obtained another note from his physician indicating that Plaintiff continued to suffer from

substantial medical problems, remained unable to work, and would be reevaluated in 30 days (*id.*

at ¶ 60).  The next day, on April 8, 2014, Doerpholz wrote another letter to Plaintiff repeating

that Plaintiff's FMLA leave had expired and advising Plaintiff that he considered the April 7,

2014 doctor's note to be a request for an extension of leave (*id.* at ¶ 62).  Doerpholz stated that

before he would decide whether to grant the request for extended leave, Plaintiff would need to

sign a blanket release for his medical records in favor of Doerpholz (*id.*).  Doerpholz also stated

that if he granted the request, Plaintiff could use his accrued benefit time and would be allowed

to exercise his right to continued health insurance through the Consolidated Omnibus Budget

Reconciliation Act ("COBRA").  Plaintiff responded with a letter from counsel dated April 10,

2014, in which Plaintiff's counsel explained that Plaintiff's FMLA leave had not expired and that

Doerpholz was not permitted to require Plaintiff to execute an unlimited medical release (*id.* at

¶¶ 63-64).  Plaintiff's counsel invited counsel for SHELD to contact him to discuss the matter

further, but the invitation was never taken up (*id.*).

    An arbitration hearing on the grievance arising out of the December 13, 2013 incident

was scheduled for April 15, 2014 (*id.* at ¶ 56).  The union and SHELD settled the matter at the

hearing (*id.*).  The settlement agreement provided that SHELD "has given assurances that its

managerial personnel will treat all employees under their supervision with civility and respect.

[SHELD] agrees it will deal appropriately with any manager or supervisor who treats employees

in an abusive or disrespectful manner" (*id.* at ¶ 56).

Plaintiff sent his next doctor's note a few days later, on April 21, 2014, again indicating that Plaintiff was not able to return to work (*id*. at ¶ 65).  This precipitated another letter from Doerpholz on May 1, 2014, in which Doerpholz repeated that Plaintiff's FMLA leave had expired, that he interpreted the note to be a request by Plaintiff for an extension of his leave, and that before Doerpholz would consider the request, Plaintiff was required to execute a release of his medical records to Doerpholz (*id*.).

In Plaintiff's next doctor's note dated May 19, 2014, Plaintiff's physician cleared Plaintiff to return to work effective May 27, 2014.  Doerpholz responded that before Plaintiff would be permitted to return to work, he would have to be examined by SHELD's physician on June 3, 2014 to determine his fitness for duty (*id*. at ¶ 68).  The examination took place as scheduled, and SHELD's physician cleared Plaintiff to return to "regular work" the following day, June 4, 2014 (*id*. at ¶ 70).  Doerpholz, however, did not return Plaintiff to work (id. at 71, 80).

On June 12, 2014, Plaintiff, through counsel, sent a letter to the three members of the Light Board (*id*. at ¶ 73).  In the letter, counsel went over the history of events involving Orr and Doerpholz's consistent failure to address them or ensure a safe and non-hostile workplace for SHELD employees (*id*. at ¶¶ 74-75).  Plaintiff's counsel referred to Plaintiff's right to initiate litigation, but advised that Plaintiff preferred that the matter be resolved outside of the judicial system, and advised that all Plaintiff wanted "[was] for the unsafe and hostile environment created by Orr and … [Doerpholz] to be brought to an end" (*id*. at ¶¶ 75-76).  Upon receipt of the correspondence, the Commissioner emailed the two other members of the Light Board and Doerpholz (*id*. at ¶ 78).  In the email, the Commissioner referenced the letter from Plaintiff's attorney and sought a discussion of it at the next Board meeting on June 25, 2014 (*id*.).  The

Commissioner asked Doerpholz to arrange for the Commissioner to review Plaintiff's and Orr's personnel files, to have a representative of the union and counsel for SHELD present at the June 25, 2014 meeting, and to give Plaintiff and Orr the opportunity to attend as well (*id*.).  The very next day, Doerpholz summoned Plaintiff to meet him in his office (*id*. at ¶ 81).  Doerpholz asked Plaintiff whether he had engaged in other work while he was out on leave (*id*. at ¶ 82).  Plaintiff denied having done so, but acknowledged having helped some friends while out on leave (*id*. at ¶¶ 83, 98).  Doerpholz placed Plaintiff on administrative leave effective immediately (*id*. at ¶ 84).

At the June 25, 2014 meeting of the Light Board, the Commissioner tried to raise the issue of Plaintiff's counsel's June 12, 2014 letter, but Doerpholz refused, telling the Commissioner it would not be discussed (*id*. at ¶ 87).  The following day, on June 26, 2014, Doerpholz wrote to Plaintiff advising Plaintiff that he was imposing an unpaid 30-day suspension on Plaintiff because Plaintiff had been untruthful when he denied having worked while out on leave (*id*. at ¶ 90).  Doerpholz actually wanted to terminate Plaintiff, but he was persuaded by counsel to impose the suspension instead (*id*.).  Nonetheless, Doerpholz advised Plaintiff that "any future violations of Department policies or rules shall result in your termination" (*id*.).

Plaintiff served his 30-day suspension and returned to work in July 2014 (*id*. at ¶ 106).  Upon his return, Doerpholz took away many of Plaintiff's prior duties and responsibilities (*id*. at ¶ 107).  Additionally, at times Plaintiff was not given work assignments, and when he was given an off-site assignment, such as meter readings or visits to residences for nonpayment, he was not allowed to go alone, but rather was accompanied by another employee as a form of "babysitting" (*id*. at ¶ 108).  For almost two months after his return to work, Plaintiff was not given keys,

which impeded his ability to discharge his duties (*id*. at ¶ 109).  He also was not placed on the call rotation for an extended period, which interfered with his opportunity to earn overtime (*id*.).

Following Plaintiff's return to work, Orr continued to target Plaintiff with harassing behavior (*id*. at ¶ 112).  Orr stared Plaintiff down as Plaintiff went about his daily business (*id*. at ¶ 112).  On one occasion in February 2015, during a training both Plaintiff and Orr attended, Orr repeatedly maneuvered himself to block Plaintiff's view of the demonstration (*id*. at ¶ 113).  At one point during the demonstration, Orr stared menacingly at Plaintiff, while stating, "Get him out of here, get him out of here now" (*id*.).  Afterward, Orr commented that he could not wait to read about his behavior in the media (*id*.).

During a meeting between Plaintiff, his union representative, and Doerpholz in September 2014 to discuss Plaintiff's working conditions since his return, Doerpholz stated that he continued to be angry with Plaintiff and blamed Plaintiff for ruining his reputation as a result of his letters to the Light Board and the attendant media coverage (*id*. at ¶ 110).  During this meeting, Doerpholz advised Plaintiff that he did not have any work for him (*id*.).

In August 2014, Plaintiff was evaluated by a physician appointed by SHELD's workers' compensation insurance carrier in connection with a claim arising from his time out of work (*id*. at ¶ 104).  The physician issued a report stating that Plaintiff's injury was causally related to work events and that Plaintiff was impaired due to those work events from December 13, 2013 through May 19, 2014 (*id*. at ¶ 104).

Plaintiff grieved his 30-day suspension, and the matter was submitted to arbitration after Plaintiff had served the suspension (*id*. at ¶¶ 99, 105-106).  Without deciding whether the order not to work was a valid order in the first instance, the arbitrator found that Plaintiff had not violated it or lied to Doerpholz when he questioned Plaintiff about it (*id*. at ¶ 105).  The arbitrator

noted "serious ethical questions raise[d] by the manner in which [SHELD's] agent obtained the 'covert' video of [Plaintiff]" (*id*.).   The arbitrator concluded that the 30-day suspension was without just cause and directed SHELD to strike it from Plaintiff's record and make him whole for his lost wages and benefits (*id*.).

III.   Discussion

A.   Standard of Review

To survive a motion to dismiss, a "complaint must contain enough factual material to raise a right to relief above the speculative level … and state a facially plausible legal claim," *Guerra-Delgado v. Popular, Inc*., 774 F.3d 776, 780 (1st Cir. 2014) (quoting *Ocasio-Hernández v. Fortuño-Burset*, 640 F.3d 1, 12 (1st Cir. 2011)), "accept[ing] as true well-pleaded facts in the complaint and draw[ing] all reasonable inferences in the pleader's favor, *id*. (citing *Tasker v. DHL Rev. Sav. Plan*, 621 F.3d 34, 38 (1st Cir. 2010)).   In resolving a motion to dismiss, the court employs a two-step approach.   *Medina-Velázquez v. Hernández-Gregorat*, 767 F.3d 103, 108 (1st Cir. 2014) (citing *Ocasio-Hernández*, 640 F.3d at 12).

> First, [the court] "must separate the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited)."   *A.G. ex. rel. Maddox v. Elsevier, Inc*., 732 F.3d 77, 80 (1st Cir. 2013) (internal quotation marks omitted).   Second, [the court] "must determine whether the remaining factual content allows a reasonable inference that the defendant is liable for the misconduct alleged."   *Id*. (internal quotation marks omitted).

*Medina-Velázquez*, 767 F.3d at 108.   While "a complaint need not plead facts sufficient to make out a prima facie case or allege all facts necessary to succeed at trial," *id*. (citing *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 717-18 (1st Cir. 2014)), the elements of a prima facie case "form[] 'part of the background against which a plausibility determination should be made.'"   *Id*. (quoting *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 54 (1st Cir.

2013)).  "An analysis of plausibility is 'a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'"  *Id*. at 109 (quoting *Grajales v. P.R. Ports Auth*., 682 F.3d 40, 44 (1st Cir. 2012)).  That said, "the court may not disregard properly pled factual allegations, 'even if it strikes a savvy judge that actual proof of those facts is improbable.'"  *Ocasio-Hernández*, 640 F.3d at 12 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  "[A] court [may not] attempt to forecast a plaintiff's likelihood of success on the merits; 'a well-pleaded complaint may proceed even if … a recovery is very remote and unlikely.'"  *Id*. at 12-13 (quoting *Twombly*, 550 U.S. at 556).

B.  Doerpholz's Motion to Dismiss

Doerpholz has moved to dismiss Plaintiff's claims brought under the MCRA and 42 U.S.C. § 1983 and for intentional infliction of emotional distress.

1.  Massachusetts Civil Rights Act

To state a claim for a violation of the MCRA, Mass. Gen. Laws ch. 12, §§ 11H and 11I, a plaintiff must allege that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'"  *Bally v. Ne. Univ*., 532 N.E.2d 49, 51-52 (Mass. 1989) (quoting Mass. Gen. Laws ch. 12, § 11H).  Doerpholz has assumed for purposes of his motion to dismiss that Plaintiff was attempting to exercise rights protected by the MCRA when he notified his union of the incidents involving Orr and Doerpholz, filed a police complaint against Orr, sought FMLA leave, and submitted letters to the Light Board complaining about Doerpholz's inadequate response to Orr's misconduct and about the unsafe work environment at SHELD under Doerpholz's management (Dkt. No. 25 at p. 7).  Therefore, the court focuses on the second

13

and third elements of an MCRA claim – that is, whether Plaintiff has alleged sufficient facts to state a facially plausible claim that Doerpholz interfered with or attempted to interfere with Plaintiff's exercise of his protected rights and did so by means of threats, intimidation, or coercion.

"The [MCRA] is a product of that time in our nation's recent history when State and private actors often brought formidable, sometimes violent, pressure to bear against racial minorities seeking to exercise equal rights under the law." *Buster v. George W. Moore, Inc.*, 783 N.E.2d 399, 409 (Mass. 2003). "Aggrieved parties often could not succeed under 42 U.S.C. § 1983, [however,] because the Federal statute requires 'State action.'" *Batchelder v. Allied Stores Corp.*, 473 N.E.2d 1128, 1130 (Mass. 1985) (citing *Williams v. Hot Shoppes, Inc.* 293 F.2d 835, 836 (D.C. Cir. 1961), *cert. denied*, 370 U.S. 925 (1962)). Thus, in enacting the MCRA, the Massachusetts Legislature intended "to provide a State remedy for deprivations of civil rights … [that] extended beyond the limits of its Federal counterpart by incorporating private action within its bounds." *Batchelder*, 473 N.E.2d at 1131. Nonetheless, while the MCRA reaches private actors, it "was not intended to create a 'vast constitutional tort,'" *Haufler v. Zotos*, 845 N.E.2d 322, 335 (Mass. 2006) (quoting *Bell v. Mazza*, 474 N.E.2d 1111, 1115 (Mass. 1985)), and "[t]he Legislature 'explicitly limited the [MCRA's] remedy to situations where the derogation of secured rights occurs by threats, intimidation or coercion,'" *Buster*, 783 N.E.2d at 409 (quoting *Bell*, 474 N.E.2d at 1115). Indeed, "[t]he Legislature intended that even a direct deprivation of a plaintiff's secured rights would not be actionable under the [MCRA] unless it were accomplished by means of one of these three constraining elements." *Id*. at 409. In the context of the MCRA,

> [a] "threat" is "the intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Mass., Inc. v. Blake*, 631 N.E.2d 985, 990 (Mass. 1994). "Intimidation" involves putting one "in fear for the purpose of

> compelling or deterring conduct. *Id*. "Coercion" is the application
> of force "to constrain him to do against his will something he
> would not otherwise have done." *Id*. (quoting *Deas v. Dempsey*,
> 530 N.E.2d 1239, 1241 (Mass. 1988)). Both threats and
> intimidation often rely on an element of actual or threatened
> physical force, *Ayasli v. Armstrong*, 780 N.E.2d 926, 936 (Mass.
> App. Ct. 2002), …. However, [the Supreme Judicial Court] ha[s]
> held that coercion is a broader category that may rely on physical,
> moral, or economic coercion. *Haufler*, 845 N.E.2d at 335-36;
> *Buster*, 783 N.E.2d at 409-411; *Planned Parenthood*; 631 N.E.2d
> at 990.

*Kennie v. Nat. Res. Dep't*, 889 N.E.2d 936, 943-44 (Mass. 2008). Whether a defendant's

conduct constitutes threats, intimidation, or coercion is evaluated under an objective reasonable

person standard. *Haufler*, 845 N.E.2d at 335. "'[T]he state of mind of the person threatened is

not controlling,' it is whether a reasonable person in [the plaintiff's] circumstance would feel

threatened, intimidated or coerced by [the defendant's] conduct." *Meuser v. Fed. Express Corp.*,

564 F.3d 507, 520 (1st Cir. 2009) (first alteration in original) (quoting *Commonwealth v.

DeVincent*, 266 N.E.2d 314, 316 (Mass. 1971)).

Accordingly, the court must determine whether Plaintiff's allegations sufficiently raise a

question as to whether a reasonable person in Plaintiff's shoes would have felt threatened,

intimidated, or coerced by Doerpholz's words and conduct to cease reporting Doerpholz's

mismanagement and Orr's misconduct outside of SHELD. *Meuser*, 564 F.3d at 520. The court

concludes that Doerpholz's alleged behavior could reasonably be found to fall into the category

of non-physical coercion. As alleged, Doerpholz was Plaintiff's boss at SHELD and had full

charge of Plaintiff's continued employment. After Plaintiff reported Orr's December 13, 2013

misconduct to the police and the union, Doerpholz told Plaintiff that he was so angry at Plaintiff

for taking the matter outside of SHELD that he was shaking with anger. Thereafter, Doerpholz

repeatedly made statements and took actions that reasonably could be perceived as calling

15

Plaintiff's continued employment with SHELD into question. When Plaintiff went out on medical leave as a result of his anxiety over the workplace situation, Doerpholz hired a private investigator to follow Plaintiff. As early as March 2014, this engagement provided Doerpholz with video evidence that Doerpholz apparently viewed as establishing that Plaintiff was impermissibly working while on leave from SHELD. Yet, it was not until June 13, 2014 – the day after Plaintiff took his concerns regarding Doerpholz and Orr to the Light Board – that Doerpholz put Plaintiff on administrative leave as a result of the supposed infraction. Similarly, it was the day after the June 25, 2014 meeting of the Light Board at which the Light Board members attempted to discuss Plaintiff's concerns that Doerpholz told Plaintiff he was suspended for 30 days without pay, a suspension which was subsequently found to be without cause. Additionally, when Plaintiff returned to work, Doerpholz withheld work assignments from him, did not allow him to perform jobs he routinely did before he went out on leave, and assigned other employees to "babysit" him off-site. A finder of fact could reasonably infer from these acts that Doerpholz was implicitly conveying that Plaintiff's job remained at risk, or that he was trying to pressure an emotionally fragile employee into leaving the workplace. During a meeting in September 2014, Doerpholz told Plaintiff that he continued to be angry with Plaintiff and blamed Plaintiff for ruining his reputation as a result of Plaintiff's letter to the Light Board and the attendant media coverage, and Doerpholz falsely told Plaintiff that SHELD did not have sufficient work for him. These factual allegations state a plausible legal claim that Doerpholz attempted to silence Plaintiff from further petitioning activity regarding Doerpholz's mismanagement and Orr's misconduct through harassment and retaliation amounting to prohibited coercion in violation of the MCRA.

This conclusion is supported by a decision of the Massachusetts Appeals Court in *Howcroft v. City of Peabody*, 747 N.E.2d 729, 745-46 (Mass. App. Ct. 2001), in which the court denied summary judgement on the plaintiff's MCRA claim against several senior police officials in their individual capacities on facts that bear some similarities to the facts alleged here.  In *Howcroft*, the plaintiff, a former police officer who suffered from severe respiratory problems that were exacerbated by second-hand smoke, had complained to his superiors about the police department's failure to comply with a state statute regarding prohibited smoking in designated areas of the station house.  There was evidence that the defendants, including the police chief, responded by ordering the plaintiff to "shut up," blowing smoke in his face, encouraging or ordering other officers to smoke in his presence, reassigning him to the station house to increase his exposure to smoke, and attempting to suspend him without pay and to deprive him of benefits to which he was subsequently found entitled.  *Id.*  The *Howcroft* court found the recited evidence sufficient to create "a triable issue [as to] whether the defendants attempted to silence [the plaintiff] by concerted harassment and retaliation amounting to prohibited intimidation."  *Id.* (citing *Planned Parenthood*, 631 N.E.2d at 990).[2]  *See also Tonneson v. Cambridge Coll.*, No. 10-12004-RWZ, 2011 WL 3798874, at *6 (D. Mass. Aug. 29, 2011) (denying the defendant college's motion to dismiss the plaintiff's MCRA claim where the plaintiff alleged that the college had terminated her in retaliation for reporting the college's and its acting president's illegal appropriations of federal and college funds).  Thus, Doerpholz is not entitled to dismissal of Plaintiff's MCRA claim at this time.

---

[2] While the *Howcroft* court concluded that the plaintiff's allegations were sufficient to state a claim for prohibited intimidation rather than prohibited non-physical coercion, the court does not view this distinction as significant, at least at the early stage of this litigation.

17

2.  <u>Section 1983</u>

"'Section 1983 supplies a private right of action against a person who, under color of state law, deprives another of rights secured by the Constitution or by federal law.'"[3]  *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011) (quoting *Redondo-Borges v. U.S. Dep't of HUD*, 421 F.3d 1, 7 (1st Cir. 2005)).  A cause of action under § 1983 is comprised of two essential elements.  First, because § 1983 does not reach private actions, *Rodríguez-Garcia v. Dávila*, 904 F.2d 90, 95 (1st Cir. 1990), a plaintiff must show "that the conduct complained of transpired under color of state law."  *Santiago*, 655 F.3d at 68 (citing *Redondo-Borges*, 421 F.3d at 7).  Second, because "Section 1983 'is not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred,'" *Albright v. Oliver*, 510 U.S. 266, 270 (1994) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)), a plaintiff must show "that a deprivation of federally secured rights ensued," *Santiago*, 655 F.3d at 68 (citing *Redondo-Borges*, 421 F.3d at 7).

The substance of Plaintiff's constitutional claim is that Doerpholz violated his First Amendment rights by retaliating against him for protected speech.  "Claims of retaliation for the exercise of First Amendment rights are cognizable under § 1983."  *Powell v. Alexander*, 391 F.3d 1, 16 (1st Cir. 2004) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977)).  There are three elements that must be met to make out a claim of unconstitutional retaliation in public employee speech cases.  First, the public employee must have been "speaking 'as a citizen on a matter of public concern.'"  *Díaz-Bigio v. Santini*, 652 F.3d 45, 51

---

[3] Specifically, § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States … to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress …."  42 U.S.C. § 1983.

(1st Cir. 2011) (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006)).  "Second, under the balancing test of *Pickering v. Board of Education*, 391 U.S. 563, 568 (1968), the employee's First Amendment interests in the speech must 'outweigh the government's interests as an employer in avoiding disruption in the workplace.'"  *Id.* (quoting *Rivera-Jiménez v. Pierluisi*, 362 F.3d 87, 94 (1st Cir. 2004)).  Third, he "must meet the 'burden of producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that his constitutionally protected conduct … was a "substantial" or "motivating" factor behind [the retaliatory action].'"  *Id.* at 51-52 (ellipses in original) (quoting *Acevedo-Diaz v. Aponte*, 1 F.3d 62, 67 (1st Cir. 1993)).  Doerpholz challenges the sufficiency of Plaintiff's § 1983 claim on the first and third elements.

"Speech involves matters of public concern 'when it can "be fairly considered as relating to any matter of political, social, or other concern to the community," or when it "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public."'"  *Lane v. Franks*, 134 S. Ct. 2369, 2380 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)).  Doerpholz claims that Plaintiff was not speaking out on a matter of public concern when he wrote to the Light Board, but rather was raising only his own personal employment concerns.  The court disagrees with Doerpholz's assessment.  According to Plaintiff's allegations, his six-page letter to the Light Board detailed Orr's lengthy history of "verbally and physically assaultive behavior, including documented occasions of actual batteries," committed on Plaintiff and other SHELD employees, as well as Doerpholz's failure to address the situation and ensure "a workplace environment free from violent, profane, threatening, intimidating, coercive and harassing behavior" for all SHELD employees (Dkt. No. 1 at ¶¶ 73 – 75).  Additionally, through his letter, Plaintiff sought a remedy for the "unsafe and hostile work environment" for all SHELD employees, such as an investigation or a management

19

study of SHELD, not a remedy specific to his own employment concerns (*id.* at ¶ 76).  A

complaint by a public employee that a statutorily appointed manager of a municipal body is

maintaining a hostile work environment, including allowing an employee to engage in harassing

and, in some instances, criminal, misbehavior, implicates the public interest.  *See Howcroft*, 747

N.E.2d at 742 (recognizing that "[s]peech about official malfeasance or abuse of office … is

speech which is of inherent public interest").  Indeed, as Plaintiff points out, his complaint

includes an allegation that Doerpholz "blamed [Plaintiff] for ruining his professional credibility

as a result of the letters to the Municipal Light Board and the attendant local media coverage"

(Dkt. No. 1 at ¶ 110).  The allegation that there was local media coverage supports an inference

that Plaintiff's letter touched on matters of public concern.

      The fact that Plaintiff had a personal interest in not being subject to verbal and physical

abuse at work does not negate the public interest in municipal departments being run within the

bounds of the law.  On this point, *Howcroft* is again instructive.  *Id.*, 747 N.E.2d at 729.  In

*Howcroft*, the defendants argued that they were entitled to summary judgment on the plaintiff's §

1983 claim because he was expressing only his own personal grievances about tobacco smoke in

the station house.  *Id.* at 734.  The court rejected this argument, reasoning that secondhand smoke

in public buildings is a matter of public concern, as was the defendants' refusal to abide by the

statute prohibiting smoking in public places.  *Id.* at 740-742.  In denying the defendants summary

judgment on this ground, the court noted that the plaintiff was not "disqualified from First

Amendment protection merely because [he] had a personal stake in the controversy."  *Id.* at 741

(alteration in original) (quoting *Caron v. Silvia*, 588 N.E.2d 711, 714 (Mass. App. Ct. 1992)).

The plaintiff's "expressions of his personal grievances d[id] not nullify the deliberate failure of

the defendants … to enforce the [statute], and the alleged flaunting of that failure in their arbitrary and abusive conduct toward [the plaintiff]." *Id*. at 741.

Moreover, in *Guilloty-Perez v. Pierluisi*, 339 F.3d 43 (1st Cir. 2003), cited by Doerpholz, the First Circuit quotes the Supreme Court for the requirement that, "[w]hether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Id*. at 52 (quoting *Connick v. Myers*, 461 U.S. 138, 147-48 (1983)). Here, at the motion to dismiss stage, Plaintiff has not yet had the opportunity to develop the record, and, therefore, dismissal on this ground would be particularly inappropriate.

Plaintiff also challenges the sufficiency of Plaintiff's allegations that Doerpholz took any retaliatory actions against Plaintiff as a result of his engagement in constitutionally protected speech. Again, the court disagrees. As stated, proof that constitutionally protected conduct was a "substantial" or "motivating" factor may be had by way of direct or circumstantial evidence. *Díaz-Bigio*, 652 F.3d at 51-52. Moreover, at the motion to dismiss stage, "the plaintiff need only allege facts sufficient to enable a reasonable inference that the employer retaliated, at least in part, in response to constitutionally protected speech." *Nethersole v. Bulger*, 287 F.3d 15, 19 (1st Cir. 2002) (emphasis in original). Plaintiff has alleged that the day after his letter was transmitted to the Light Board, Doerpholz placed Plaintiff on paid administrative leave for his alleged violation of the no-outside-work rule, which Doerpholz would have been aware of for several months by that time. Furthermore, Doerpholz shut down the Light Board's discussion of Plaintiff's letter at its first meeting following receipt of the letter, and, the very next day, he advised Plaintiff that he was being suspended for thirty days without pay. The temporal relationship between Plaintiff's alleged protected conduct and Doerpholz's alleged retaliatory

actions is sufficient to raise an inference that the former was a motivating factor of the latter.  *Id.*

at 20 ("'[C]lose temporal proximity between two events may give rise to an inference of causal

connection.'" (alteration in original) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151,

168 (1st Cir. 1998))).

> 3.  <u>Intentional Infliction of Emotional Distress</u>

To prevail on a claim for intentional infliction of emotional distress, the plaintiff must

show (1) that the defendant intended to inflict emotional distress or knew or should have known

that emotional distress was the likely result; (2) that the conduct was "extreme and outrageous,"

"beyond all possible bounds of decency," and "utterly intolerable in a civilized community;" (3)

that the actions of the defendant were the cause of the plaintiff's distress; and (4) that the

emotional distress sustained by the plaintiff was "severe" and of a nature that "that no reasonable

[person] could be expected to endure it."  *Agis v. Howard Johnson Co.*, 355 N.E.2d 315, 318-19

(Mass. 1976).  A claim does not lie where "'only bad manners and mere hurt feelings [were]

involved.'"  *Agis,* 355 N.E.2d at 319 (quoting *Womack v. Eldridge*, 210 S.E.2d 145, 148 (Va.

1974)).  On the other hand, "[r]epeated harassment … may compound the outrageousness of

incidents which, taken individually, might not be sufficiently extreme to warrant liability for

infliction of emotional distress.  *Boyle v. Wenk*, 392 N.E.2d 1053, 1055-56 (Mass. 1979).

Additionally, "[c]onduct otherwise reasonable may become tortious when directed at an

individual known to be particularly susceptible to infliction of emotional distress."  *Id*. at 1056

(citing Restatement (Second) of Torts § 46, Comment F, Illustrations 9-11 (1965)).  Where

reasonable people could differ whether the conduct is "extreme and outrageous," there is an issue

for the jury, *id*. at 1057 (citing *Agis*, 355 N.E.2d at 319), and "the jury are entitled to draw all

reasonable inferences from the totality of the circumstances," *id*. at 1056 (citing *Poirier v. Plymouth*, 372 N.E.2d 212, 219 (Mass. 1978)).

Doerpholz challenges the sufficiency of Plaintiff's intentional infliction of emotional distress claim on two grounds.  First Doerpholz argues that Plaintiff's claim is barred by the exclusivity provisions of the Workers' Compensation Act.  Second, Doerpholz argues that even if the claim is not barred, Plaintiff's allegations do not rise to the level necessary to create liability for intentional infliction of emotional distress.  The court rejects both arguments.

While the Massachusetts Supreme Judicial Court has held that "a suit for an intentional tort [committed] in the course of the employment relationship is barred by the exclusivity provision of the Workers' Compensation Act," *Anzalone v. Mass. Bay Transp. Auth*., 526 N.E.2d 246, 249 (Mass. 1988), the exclusivity provision does not bar an employee from suing a co-employee for intentional torts committed outside the scope of employment and unrelated to the interest of the employer.  *Id*. (citing *O'Connell v. Chasdi*, 511 N.E.2d 349, 351 (Mass. 1987)). *See also Brown v. Nutter, McLennen & Fish*, 696 N.E.2d 953, 956 (Mass. App. Ct. 1998) ("Coemployees … are not immunized from suit by the workers' compensation act for tortious acts which they commit outside the scope of their employment, which are unrelated to the interest of the employer.").  This requires a fact-intensive analysis.  *Id*. at 956-57.

The court concludes that Plaintiff has sufficiently alleged tortious conduct by Doerpholz that could be considered outside the scope of his employment and unrelated to SHELD's interests.  Among other things, Plaintiff has alleged that Doerpholz made statements and took acts threatening Plaintiff's employment, hired a private investigator to follow Plaintiff, refused to let Plaintiff return to work when he had been cleared by his doctor, and subjected Plaintiff to a 30-day administrative leave without just cause.  Plaintiff asserts that Doerpholz took these

actions as part of a personal vendetta against Plaintiff because of the damage Plaintiff's complaints caused to Doerpholz's reputation.  "At this early stage of the proceeding, it [would be] premature to say that [Plaintiff], after conducting discovery, will be unable to prove any set of facts demonstrating that [Doerpholz] was acting neither within the course of his employment nor in furtherance of his employer's interest." *Id.* at 957 (citing *Catalano v. First Essex Sav. Bank*, 639 N.E.2d 1113, 1117 (Mass. App. Ct. 1994)).  Therefore, dismissal based on the exclusivity provision of the Worker's Compensation statute is inappropriate at this stage of the litigation.

Moreover, Plaintiff has sufficiently stated a claim for intentional infliction of emotional distress.  Plaintiff claims to have suffered serious emotional harm as a result of Doerpholz's conduct over a lengthy span of time, including anxiety of such a degree that it prevented Plaintiff from working for several months, and that Doerpholz's conduct continued even after Doerpholz was aware of Plaintiff's intense and debilitating anxiety.  Accordingly, Plaintiff alleges facts that could lead a trier of fact viewing the totality of the circumstances and drawing all reasonable inferences in Plaintiff's favor to conclude that Doerpholz's conduct as alleged was extreme and outrageous and caused Plaintiff severe emotional distress.  *See Thomas v. Town of Salisbury*, 134 F. Supp. 3d 633, 651 (D. Mass. 2015) (denying the defendants' motion to dismiss an IIED claim where the plaintiff alleged that the defendants engaged in a prolonged plan to force the plaintiff out of his job).

C.  Orr's Motion to Dismiss

Orr has moved to dismiss Plaintiff's claims brought under the MCRA and 42 U.S.C. § 1983 and for intentional infliction of emotional distress.  In addition to arguing that Plaintiff has

failed to state a claim under the MCRA or § 1983, Orr argues that he is entitled to qualified immunity from suit.

      1.  <u>Massachusetts Civil Rights Act</u>

As set forth above, to establish a claim under the MCRA, a plaintiff must demonstrate that "(1) his exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth (2) has been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" *Bally*, 532 N.E.2d at 51-52 (footnote omitted) (quoting Mass. Gen. Laws ch. 12, § 11H). The MCRA's remedy is "'explicitly limited … to situations where the derogation of secured rights occurs by threats, intimidation, or coercion.'" *Buster*, 783 N.E.2d at 409 (quoting *Bell*, 474 N.E.2d at 1115). "[A] direct deprivation of a plaintiff's secured rights [is] not … actionable under the act unless … accomplished by means of one of these three constraining elements." *Id*. Orr challenges the sufficiency of Plaintiff's allegations on the second and third elements, arguing that Plaintiff has failed to allege any interference or attempted interference by Orr with any of the secured rights Plaintiff has identified and that Plaintiff has failed to allege any conduct by Orr that constitutes threats, intimidation, or coercion.

To defend his MCRA claim against Orr's motion, Plaintiff divides his factual allegations regarding Orr into two groups. The first group consists of the discrete incident involving Orr and Plaintiff on December 13, 2013, and the second group consists of all of the events that followed, including Orr's staring Plaintiff down at the end of the day on December 13, 2013 and on a systematic basis after Plaintiff returned to work in July 2014, as well as the instance in February 2015 when Orr repeatedly blocked Plaintiff's view of a training and then stared menacingly at Plaintiff while stating, "Get him out of here, get him out of here now." As to the incident on

December 13, 2013, Plaintiff claims that Orr's actions deprived or attempted to deprive Plaintiff

of his contractually-secured (pursuant to SHELD's personnel policy manual and the collective

bargaining agreement) rights to a safe working environment and the "prospect[] of continued

employment" (Dkt. No. 22 at p. 10).[4]  Plaintiff's theory is that when Orr committed an assault

and battery on Plaintiff by advancing on Plaintiff and touching him on the chest with a piece of

paper, Orr committed a direct, and hence non-actionable under the MCRA, deprivation of

Plaintiff's rights.[5]  However, Plaintiff argues that thereafter, when Orr attempted to lure Plaintiff

into further fighting behavior by moving his hand under his chin several times and telling

Plaintiff, "Go ahead and hit me," and when Plaintiff did not fight back, telling Plaintiff to follow

him upstairs, Orr deprived or attempted to deprive Plaintiff of his contractually-secured right to a

safe working environment and to continued employment by means of threats, intimidation, and

coercion.

Plaintiff seeks to draw too fine a distinction.  Orr's unsuccessful attempt to lure Plaintiff

into fighting back does not constitute a separate event or attempt to coerce Plaintiff into giving

up his contractual right to a safe working environment, but, rather, a continued direct violation of

that right, which started with the alleged assault and battery.[6]  Nor does Orr's unsuccessful effort

[4] Plaintiff also claims that Orr's actions during the December 13, 2013 encounter deprived or attempted to deprive him of his constitutional right to bodily integrity guaranteed by substantive due process (Dkt. No. 22 at p. 10).  The court rejects this argument in the context of analyzing Plaintiff's § 1983 claim and will not separately address it here as the analysis is the same.

[5] Plaintiff does not make this concession in quite so many words.  What Plaintiff states is that the assault and battery is "potentially" a direct deprivation (Dkt. No. 22 at p. 8).  However, after acknowledging this "potential," Plaintiff makes no argument as to how the assault and battery is a deprivation by threats, intimidation, or coercion.  Thus, Plaintiff effectively concedes that the assault and battery, if it was a deprivation of Plaintiff's rights, was a direct deprivation.

[6] As discussed in footnote 5, Plaintiff concedes that the assault and battery was a direct violation of his rights, although the right that he claims was violated was his constitutional right to remain free from the excessive use of force.  The court rejects this argument in the context of analyzing Plaintiff's § 1983 claim and will not separately address it here as the analysis is the same.

to get Plaintiff to fight back constitute an attempt to coerce Plaintiff into giving up his

contractual right to continued employment.  Plaintiff's reasoning – that if Plaintiff had fought

back, he would have faced an employment sanction, including termination – is too attenuated

and speculative a basis on which to premise MCRA liability.  Finally, Orr's telling Plaintiff to

follow him upstairs does not constitute an attempt to coerce Plaintiff into giving up his

contractual right to continued employment.  Even accepting as reasonable Plaintiff's suggested

inference that by telling Plaintiff to follow him upstairs, Orr was attempting to pursue an adverse

employment action against Plaintiff – presumably by reporting Plaintiff to Doerpholz – Orr did

not need Plaintiff to follow him upstairs in order to do so.  Whether or not Plaintiff followed Orr

upstairs, Orr could have gone to report his version of events to Doerpholz and sought Plaintiff's

termination.  There is no means-end relationship between what Orr was allegedly trying to

coerce Plaintiff to do, i.e. to go upstairs, and the supposed right of which Orr was attempting to

deprive Plaintiff, i.e. Plaintiff's right to continued employment, such as would support MCRA

liability.

As to the events following the December 13, 2013 incident, Plaintiff claims that his

complaint supports the inference that Orr's "tactic[s] of intimidation [were] designed to coerce

[Plaintiff] into refraining from future reporting of Orr's misbehavior, a protected right of

[Plaintiff's] …, and that the staring down is physically threatening, intimidating and coercive"

(Dkt. No. 22 at p. 12).  Plaintiff reasons that the inference he advances is "exceedingly fair" due

---

However, the court proceeds with the MRCA analysis based on Plaintiff's invocation of a
contractually-secured right to a safe working environment, which presumably would encompass
a workplace free from the excessive use of force.  Plaintiff fails to state a claim either way.

to the temporal proximity between Plaintiff's protected activity of filing a complaint with the

police on December 13, 2013, and the staring down and other behaviors that followed (*id.*).

Again, the court disagrees.  The only alleged staring down that was truly close in time

was the December 13, 2013 end-of-the-day staring.  However, Plaintiff's characterization of that

behavior as intended to coerce Plaintiff into refraining from filing further criminal complaints

against Orr is too speculative to support the claim.  The alleged facts are capable of supporting

an inference that Orr was unhappy with Plaintiff for filing a criminal complaint against him, but

they do not support a further inference that, by staring menacingly at Plaintiff, Orr was sending

an unspoken but threatening, intimidating, and coercive message that he would exact some sort

of retribution if Plaintiff ever filed a criminal complaint against Orr again.  The staring down of

Plaintiff when he returned from his leave and the comment to the effect of, "Get him out of here,

get him out of here now," which were significantly removed in time from when Plaintiff filed the

criminal complaint, suffer from the same infirmity.  Plaintiff additionally suggests that Orr's

hostile behavior adversely effected Plaintiff's contractually secured right to a safe working

environment, but to the extent it did, the violation was direct and not by means of threats,

intimidation, or coercion.  Accordingly, Plaintiff fails to state a MCRA claim against Orr.

> 2.  42 U.S.C. § 1983

As set forth above, a cause of action under § 1983 requires proof of two elements – that

the complained-of conduct transpired under color of state law and that a deprivation of the

plaintiff's federally secured rights ensued.  *Santiago*, 655 F.3d at 68 (citing *Redondo-Borges*,

421 F.3d at 7).  Plaintiff claims that Orr was operating under color of law as a public official

when he used excessive force on Plaintiff on December 13, 2013, thereby violating Plaintiff's

Fourth Amendment right to remain free from the unreasonable use of force by a public officer

and his Fourteenth Amendment due process right to "bodily integrity" (Dkt. No. 1, at ¶¶ 135-39; Dkt. No. 22, at pp. 16-17).  Orr challenges the sufficiency of Plaintiff's allegations as to both elements.

      (a) <u>Under Color of State Law</u>

"It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State." *West v. Atkins*, 487 U.S. 42, 49-50 (1988) (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961), *overruled in part on other grounds, Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)).  Thus, as a general matter, a person employed by the state "acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law." *Id.* at 50 (citing *Parratt v. Taylor*, 451 U.S. 527, 535-36 (1981); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)).  Not every act by a public employee is under color of law simply because of his or her status as a public employee, however.  "The acts of state officials 'in the ambit of their personal pursuits' are not state action." *Martínez v. Colon*, 54 F.3d 980, 986 (1st Cir. 1995) (quoting *Screws v. United States*, 325 U.S. 91, 111 (1945)).  "The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." *Id.* (citing *West*, 487 U.S. at 50).  "One relevant facet of this inquiry is whether the defendant has purported to act under color of state law or, in other words, has acted under 'pretense of law.'" *Parilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 449 (1st Cir. 1997) (citing *Screws*, 325 U.S. at 111; *Martínez*, 54 F.3d at 987).  "Even though 'acting under color of law' includes 'acting under pretense of law' for purposes of a state action analysis, there can be no pretense if the challenged conduct is not related in some meaningful way either to the officer's governmental status or to the performance of his duties." *Martínez*, 54 F.3d at 987.

"Therefore, it is not enough for an individual merely to purport to exercise official power in order to trigger § 1983 liability, but rather the individual must actually be engaged in the abuse of official power granted by the government." *Parilla-Burgos*, 108 F.3d at 449 (citing *West*, 487 U.S. at 49; *Martínez*, 54 F.3d at 986). The assessment of the nature of the actor's conduct must be made in light of the totality of the surrounding circumstances, *Martínez*, 54 F.3d at 987, and the outcome "rarely depends on any single, easily determinable fact." *Id*. at 986.

According to Orr, the conduct attributed to him in the complaint was not within the authority of, or in furtherance of any actual or apparent duty of his office, and, therefore, Plaintiff has failed to sufficiently allege state action (Dkt. No. 19 at p. 11). The court disagrees. The locus of Plaintiff's § 1983 claim against Orr is the December 13, 2013 incident between Plaintiff and Orr. Plaintiff alleges that this incident occurred in the SHELD offices during working hours and was precipitated by a dispute over a customer service issue. It is reasonable to infer from the allegations that Orr was attempting to exercise the supervisory authority allegedly delegated to him by Doerpholz by directing Plaintiff's activities in responding to the customer service issue. These allegations are sufficient to allege state action by Orr. *See, e.g., Doe v. Fournier*, 851 F. Supp. 2d 207, 220-21 (D. Mass. 2012) (holding that a reasonable juror could conclude that the defendant was acting under color of state law based on the plaintiff's allegations that the defendant had the opportunity to harass and solicit sex from the plaintiff by virtue of his authority as a high school guidance counselor and football coach, notwithstanding the fact that his actions were not authorized – and even were prohibited – by the school).

The case on which Orr relies in support of dismissal, *Martínez v. Colon*, 54 F.3d at 980, does not alter this conclusion. In *Martínez*, the plaintiff police officer had been maimed by a fellow officer, who was harassing and threateningly pointing his service revolver at the plaintiff

in the station house when it accidentally discharged. *Id.* On appeal, the First Circuit was called

upon to review the district court's grant of summary judgment to three other officers, who the

plaintiff alleged owed him a constitutional duty to intervene and protect him from harm at the

hands of the shooting officer, but breached that duty by inaction, thereby violating his right to

substantive due process. *Id.* at 983-84. The court first noted that, pursuant to the Supreme Court

decision in *DeShaney v. Winnebago County Social Services Department*, 489 U.S. 189 (1989), "a

State's failure to protect an individual against private violence … does not constitute a violation

of the Due Process Clause." *Martínez*, 54 F.3d at 984 (quoting *DeShaney*, 489 U.S. at 197).

Thus, to resolve the issue on appeal, the court had to determine whether the shooting officer was

engaged in private violence when he accidentally shot the plaintiff or violence committed while

he was acting under color of state law. *Id.* at 986. Examining the record, the court determined

that the fellow officer was "bent on a singularly personal frolic [of] tormenting [the plaintiff],"

and that his violence could not be treated as state action where his "status as a police officer

simply did not enter into his benighted harassment of [the plaintiff]," nor were his actions "in

any meaningful way related either to his official status or to the performance of his police

duties." *Id.* at 987. The *Martínez* court made its determination on the basis of a developed

summary judgment record and stressed the fact-intensive nature of the inquiry. *Id.* at 986-88.

"[C]ourts must beware simplistic solutions." *Id.* at 986. "[S]egregating private action from state

action calls for a more sophisticated analysis." Id. Thus, the conclusion the court draws from

*Martínez* is that final resolution of the question of whether Orr was acting under color of law,

including under pretense of law, when the incident with Plaintiff occurred calls for a developed

factual record. *Martínez* does not counsel dismissal at this early stage of the litigation on the

issue of state action.

(b) <u>Deprivation of a Federally Secured Right</u>

"In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979)).  Plaintiff invokes the Fourth Amendment proscription against the use of unreasonable force and the Fourteenth Amendment due process right to "bodily integrity" as the sources of his substantive rights.

(i)    <u>Fourth Amendment</u>

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures."  U.S. Const. amend. IV. In order to sustain his claim under the Fourth Amendment, Plaintiff must be able to establish that Orr seized him within the meaning of the Fourth Amendment at the time Orr utilized excessive force on him.  *Stamps v. Town of Framingham*, 38 F. Supp. 3d 146, 151 (D. Mass. 2014) (citing *Graham v. Connor,* 490 U.S. 386, 394 (1989); *Bastien v. Goddard,* 279 F.3d 10, 14 (1st Cir. 2002)).  "Implicit in th[e] language [of the amendment] is the notion that [it] applies to a limited range of governmental conduct."  *United States v. Attson*, 900 F.2d 1427, 1429 (9th Cir. 1990). *See also Heinrich ex rel. Heinrich v. Sweet*, 62 F. Supp. 2d 282, 317 (D. Mass. 1999) ("By its plain language … the Fourth Amendment only applies to 'searches and seizures.'") (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998))).  In particular, "[t]he phrase 'searches and seizures' connotes that the Fourth Amendment regulates conduct that is 'somehow designed to elicit a benefit for the government in an investigatory, or, more broadly, an administrative capacity.'"  *Doe v. Luzerne Cty.*, 660 F.3d 169, 179 (3d Cir. 2011) (quoting *Attson*, 900 F.2d at 1429).  While Fourth Amendment cases typically involve challenges to the actions of law

enforcement officers conducting criminal investigations, the protections of the amendment have been held to extend to certain conduct by non-law enforcement governmental actors conducting civil investigations, administrative inspections, and, in the government's capacity as an employer, drug testing and searches of the personal property of government employees. *See Nat'l Treasury Emps. Union v. Von Raab*, 489 U.S. 656, 665 (1989) (holding the Fourth Amendment applicable to the U.S. Customs Service's drug testing of its employees); *O'Connor v. Ortega*, 480 U.S. 709, 715 (1987) (plurality opinion) (holding the Fourth Amendment applicable to state hospital officials' search of a physician-employee's office and seizure of his personal items as part of an investigation into workplace misconduct); *New Jersey v. T.L.O.*, 469 U.S. 325, 333 (1985) (holding the Fourth Amendment applicable to a public school official's search of a student's purse for contraband); *Marshall v. Barlow's, Inc.*, 436 U.S. 307, 313 (1978) (holding the Fourth Amendment applicable to OSHA inspections of private businesses for regulatory compliance); *Michigan v. Tyler*, 436 U.S. 499, 506 (1978) (holding the Fourth Amendment applicable to firefighters inspecting a private premises to ascertain the cause of a fire); *Camara v. San Francisco Mun. Ct.*, 387 U.S. 523, 535 (1967) (holding the Fourth Amendment applicable to routine administrative inspections of private property by municipal health and safety officials for compliance with fire, health, and housing codes).

Despite the breadth of protection from unreasonable government action provided by the Fourth Amendment, it is not unlimited, and where, as here, "the challenged conduct falls outside the area to which the fourth amendment most commonly and traditionally applies – law enforcement," it is particularly important for courts to make a threshold inquiry as to its applicability. *Attson*, 900 F.2d at 1429-430. In a leading case, *United States v. Attson*, 900 F.2d at 1427, the Ninth Circuit explained that, "[i]n order for [a court] to determine whether non-law

enforcement governmental conduct can be considered a 'search' or a 'seizure' under the fourth amendment, it is … necessary … to evaluate whether such conduct has as its purpose the intention to elicit a benefit for the government in either its investigative or administrative capacities." *Id*. at 1431.

> Under the proper factual circumstances …, governmental conduct that is motivated by investigatory or administrative purposes will fall within the scope of the fourth amendment since such conduct constitutes a search or seizure, the type of conduct that is regulated by the amendment. This, in turn, implies that governmental conduct which is not actuated by an investigative or administrative purpose will not be considered a "search" or "seizure" for purposes of the fourth amendment.

*Id*. "[U]nlike the 'state actor' requirement of the fourteenth amendment, the fourth amendment cannot be triggered simply because a person is acting on behalf of the government." *Id*. at 1429.

The Ninth Circuit turned to cases dealing with the application of the Fourth Amendment to private parties claimed to have been acting as agents of the government for guidance. *Id*. at 1432. The court reasoned that:

> [b]oth of these analyses proceed from the premise that at its core the fourth amendment was designed to apply to the conduct of law enforcement officials engaged in criminal investigations and that if the application of the fourth amendment is to expand beyond that core, the conduct to which it expands must approximate the types of activities to which the amendment is primarily directed; in other words, such conduct must be considered a 'search' or 'seizure.' In addition, both analyses require us to gauge whether the party whose actions are challenged intended to assist the government in activities ("searches or seizures") covered by the fourth amendment, or whether his motivation was independent of such considerations.

*Id*. at 1432. In either case, "a party is subject to the fourth amendment only when he or she has formed the necessary intent to assist in the government's investigative or administrative functions …. The fourth amendment will not apply when the … party was acting for a reason

that is independent of such a governmental purpose." *Id*. at 1433.  Applying the test to the facts

before it, the *Attson* court determined that the Fourth Amendment did not apply to the actions of

a governmentally-employed physician, who took a blood sample from the defendant and

conducted a blood alcohol analysis on it, because the physician had acted for purely medical

reasons and did not possess the requisite intent to engage in a search or seizure under the Fourth

Amendment, notwithstanding the fact that the prosecution ultimately obtained the evidence in

response to a grand jury subpoena and used it in defendant's trial for manslaughter.  *Id*. at 1433.

No First Circuit case establishes the standard it would apply to Fourth Amendment

challenges to non-law enforcement governmental conduct like that presented in *Attson* and on

the facts of the instant case, but the court has addressed the question of when a private party

alleged to have been acting as an agent for the government is subject to the Fourth Amendment.

In *United States v. Pervaz*, 118 F.3d 1 (1st Cir. 1997), the First Circuit agreed with *Attson* that

"the extent to which the private party aims primarily to help the government or serve its own

interests" is an important factor.  *Id*. at 6.  However, the court reasoned that two additional

factors, "the government's role in instigating or participating in the search [and] its intent and the

degree of control it exercises over the search and the private party," might be relevant in certain

circumstances as well.  *Id*. at 6.  Because this court agrees with the *Attson* court's logic that the

determination of whether the conduct of a non-law enforcement governmental actor is subject to

the Fourth Amendment is "analytically quite similar" to the determination of whether the

conduct of a private party alleged to have been acting as an agent for the government is subject

to the Fourth Amendment, *id*., 900 F.2d at 1432, this court will apply the test formulated by the

First Circuit in *Pervaz* to determine whether Orr's challenged conduct is subject to the Fourth

Amendment.  *Id*., 118 F.3d at 6.

In applying the *Pervaz* factors, however, the court is mindful of an observation by the Eighth Circuit in *United States v. Inman*, 558 F.3d 742 (8th Cir. 2009), that when the actor is a non-law enforcement governmental party as opposed to a private party claimed to have been acting as an agent for the government, the question of whether the actor intended to assist the government or instead to further his or her own purposes is of paramount importance. *Id*. at 745. In *Inman*, the defendant, a municipally-employed paramedic, brought a Fourth Amendment motion to suppress in connection with his supervisor's accessing his computer and opening and observing files containing child pornography, which the supervisor subsequently reported to law enforcement. *Id*. at 745. The Eighth Circuit affirmed the district court's denial of the defendant's motion to suppress, finding that the supervisor's actions did not implicate the Fourth Amendment because he had not accessed the defendant's computer at the request or direction of law enforcement, but rather to satisfy his own curiosity about the defendant's new girlfriend. It was only once he was on the defendant's computer that he observed the files containing the pornographic images, which he opened based on their suspicious filenames. *Id*. at 745-46. This court agrees with the *Inman* court's observation because, in situations where the party alleged to have violated the Fourth Amendment is a non-law enforcement governmental actor, the government will always be instigating and participating in the search and exercising control over the actor in some sense, since the actor is a governmental employee. Therefore, this court will place the most weight on the intent factor. *See also Doe v. Luzerne Co.*, 660 F.3d 169, 179 (3d Cir. 2011) (holding the Fourth Amendment inapplicable to a police supervisor's actions in recording and disseminating a video and images of the plaintiff, an officer under his command, in a state of partial undress, where the summary judgment record showed he acted for personal reasons); *Poe v. Leonard*, 282 F.3d 123, 136-37 (2d Cir. 2002) (holding the Fourth Amendment

inapplicable to a police officer's actions in videotaping the plaintiff, a fellow officer, in a state of partial undress while in her changing room, where the summary judgement record showed he acted for "personal reasons" and "outside of a criminal investigation or other form of governmental investigation or activity").

Turning to the instant case, Plaintiff argues that Orr seized him on December 13, 2013, when Orr followed Plaintiff into an office, advanced upon Plaintiff, and, after touching Plaintiff on the chest with a piece of paper, told Plaintiff to follow him upstairs (Dkt. No. 22 at p. 18). The focus of Plaintiff's argument is that a reasonable person in Plaintiff's position would not have felt free to leave based upon these actions by Orr and thus, he has alleged a seizure. Assuming for purposes of argument that Orr is correct and a reasonable person in Plaintiff's position would not have felt free to leave, Orr bypasses the threshold inquiry of whether the alleged facts implicate the Fourth Amendment. The court concludes that they do not. Plaintiff does not allege, nor do his allegations support an inference, that Orr acted to elicit a benefit for SHELD in an investigative or administrative capacity or in its capacity as Plaintiff's employer through his actions on December 13, 2013. According to Plaintiff, Orr's actions on that date were "an instance of horrendous workplace bullying" (Dkt. No. 22 at p. 20), a characterization directly at odds with the notion that Orr could have been acting to further any investigative or administrative interests of SHELD or SHELD's interest as a government employer. Indeed, Plaintiff has alleged that the activities violated SHELD's obligation to provide a safe workplace for its employees pursuant to its personnel policy manual and the collective bargaining agreement. *See Heinrich*, 62 F. Supp. 2d at 317 (dismissing the plaintiffs' § 1983 claims premised on alleged Fourth Amendment violations by government and private actors who conducted dangerous medical experiments on terminally ill patients without their knowledge or

consent because the allegations could not support an inference that the defendants were

motivated by investigative or administrative concerns where they were conducting medical and

scientific investigations).  Moreover, Plaintiff has not alleged that any law enforcement agent or

other governmental agent instigated, participated, or controlled Orr's actions on December 13,

2013, for any investigative or administrative concerns or concerns relating to SHELD's interests

as an employer.  Because Plaintiff has not sufficiently alleged a seizure within the meaning of

the Fourth Amendment, Plaintiff cannot rely on it as the source of his substantive rights for

purposes of his § 1983 claim.

(ii)    Fourteenth Amendment

In order for Plaintiff to sustain his excessive force claim under the Fourteenth

Amendment, he must be able to show that Orr's actions shock the conscience and that Orr

violated a right otherwise protected by the substantive Due Process Clause.  *Martinez v. Cui*, 608

F.3d 54, 64 (1st Cir. 2010).  The First Circuit does not require that one showing necessarily

precede the other, but it typically looks first to whether the alleged acts shock the conscience.

*Harron v. Town of Franklin*, 660 F.3d 531, 536 (1st Cir. 2011).  Accordingly, this court will

follow that order here.

"Substantive due process is a constitutional cause of action that leaves the door 'slightly

ajar for federal relief in truly horrendous situations.'"  *Clark v. Boscher*, 514 F.3d 107, 112 (1st

Cir. 2008) (quoting *Nestor Colon-Medina & Sucesores, Inc. v. Custodio*, 964 F.2d 32, 45 (1st

Cir. 1992)).  "The burden to show state action that 'shocks the conscience' is extremely high,

requiring 'stunning' evidence of 'arbitrariness and caprice' that extends beyond '[m]ere

violations of state law, even resulting from bad faith' to 'something more egregious and more

extreme.'"  *Melendez–Garcia v. Sanchez*, 629 F.3d 25, 37 (1st Cir. 2010) (alteration in original)

38

(quoting *J.R. v. Gloria*, 593 F.3d 73, 80 (1st Cir. 2010)).  "In order to 'shock the contemporary conscience,' state action must be 'egregious' and 'outrageous.'"  *Id.* (quoting *Rivera v. Rhode Island*, 402 F.3d 27, 36 (1st Cir. 2005)).  *See also Elena v. Municipality of San Juan*, 677 F.3d 1, 7-8 (1st Cir. 2012) ("State conduct violates an individual's substantive-due-process rights when it is 'so brutal, demeaning, and harmful that it is shocking to the conscience." (quoting *Maymí v. P.R. Ports Auth.*, 515 F.3d 20, 30 (1st Cir. 2008))).  Given the exceedingly high standard, the court concludes that Plaintiff's allegations that Orr followed Plaintiff into an office, advanced upon Plaintiff, and, after touching Plaintiff on the chest with a piece of paper, told Plaintiff to follow him upstairs, do not rise to the level of truly horrendous facts sufficient to shock the conscience.  *See, e.g.*, *Kennedy v. Town of Billerica*, 617 F.3d 520, 540 (1st Cir. 2010) (finding that a police officer's kicking the plaintiff's car door repeatedly and swearing at her for several minutes may have been "reprehensible," but fell short of conscience-shocking, even if the actions were part of a decade-long campaign of harassment).

Turning to the remaining prong, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity."  *Albright v. Oliver*, 510 U.S. 266, 272 (1994).  Plaintiff purports to invoke the right to bodily integrity, arguing that "Orr's actions to threaten, while in close physical proximity to [Plaintiff] …, the imminent onset of additional physical violence represents an attempt to interfere with [Plaintiff's] right to bodily integrity, a necessary component of which is the right *not* to engage in fighting behavior …." (Dkt. No. 22 at p. 10).  Plaintiff cites authority for the general proposition that a right to bodily integrity exists.  However, there is no "absolute, generalized substantive due process right to the protection of bodily integrity from executive action," *Martinez*, 608 F.3d at 66, and Plaintiff cites no authority for the proposition that the

constitutional right to bodily integrity is violated when a state actor tries to lure someone into a fight.

Because Plaintiff has not alleged behavior that shocks the conscience and that violates a right otherwise protected by the substantive Due Process Clause, Plaintiff cannot rely on the Fourteenth Amendment as the source of his substantive rights for purposes of his § 1983 claim.

### 3. Qualified Immunity

"Qualified immunity protects government officials from trial and monetary liability unless the pleaded facts establish '(1) that the official violated a statutory or constitutional right, and (2) that the right was "clearly established" at the time of the challenged conduct.'" *Marrero-Méndez v. Calixto-Rodríguez*, No. 14-2030, 2016 WL 3902635, at *3 (1st Cir. July 19, 2016) (quoting *Ashcroft v. al–Kidd*, 563 U.S. 731, 735 (2011)). "[T]he same qualified immunity standard that applies under § 1983 has also been held to apply to claims under the MCRA." *Kelley v. LaForce*, 288 F.3d 1, 10 (1st Cir. 2002) (citing *Duarte v. Healy*, 537 N.E.2d 1230, 1232 (Mass. 1989)). Consequently, "a state official cannot be held liable under the MCRA for discretionary official actions that violate (federal or state) constitutional or statutory rights unless those rights were clearly established at the time of the violation and the official's actions were objectively unreasonable." *Kelley*, 288 F.3d at 10. The prongs can be addressed in either order, and, if either is not met, the official is immune. *Marrero-Méndez*, 2016 WL 3902635, at *3 (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)).

Orr is entitled to qualified immunity. First, as stated above, Plaintiff has not sufficiently pleaded a violation of a statutory or constitutional right. Second, even if Orr violated Plaintiff's rights, they were not "clearly established" at the time.

> The … analysis of whether a right was "clearly established" …
> divides into two parts: "(1) 'the clarity of the law at the time of the

40

> alleged civil rights violation,' and (2) whether, given the facts of
> the particular case, 'a reasonable defendant would have understood
> that his conduct violated the plaintiff['s] constitutional rights.'"
> *Barton v. Clancy*, 632 F.3d 9, 22 (1st Cir. 2011) (alteration in
> original) (quoting *Maldonado v. Fontanes*, 568 F.3d 263, 269 (1st
> Cir. 2009)).  An affirmative finding on these inquiries does "not
> require a case directly on point, but existing precedent must have
> placed the ... constitutional question beyond debate." *Ashcroft,*
> 563 U.S. at 741.  —— U.S. ——, 131 S. Ct. 2074, 2083, 179
> L.Ed.2d 1149 (2011).  At bottom, "the salient question is whether
> the state of the law at the time of the alleged violation gave the
> defendant fair warning that his particular conduct was
> unconstitutional." *Maldonado,* 568 F.3d at 269.

*Glik v. Cunniffe*, 655 F.3d 78, 81 (1st Cir. 2011).  *See also Marrero-Méndez*, 2016 WL 3902635,

at *4 ("[W]hile the precise violative action at issue need not have previously been held unlawful,

*Anderson v. Creighton*, 483 U.S. 635, 640 (1987), the existing precedent from in and out of

circuit 'must have placed the statutory or constitutional question beyond debate,' *al-Kidd*, 563

U.S. at 741; see *Barton*, 632 F.3d at 22).  "The inquiry 'must be undertaken in light of the

specific context of the case, not as a broad general proposition.'" *Marrero-Méndez*, 2016 WL

3902635, at *4 (quoting *Mullenix v. Luna*, 136 S. Ct. 305, 308 (per curiam)).  That the putative

rights were not clearly established is evident from Plaintiff's inability to cite authority

articulating the application of the Fourth Amendment or the general right to bodily integrity to

the atypical circumstances in this case.

4.   Intentional Infliction of Emotional Distress

Orr challenges the sufficiency of Plaintiff's intentional infliction of emotional distress

claim on the same two grounds as Doerpholz, namely that Plaintiff's claim is barred by the

exclusivity provisions of the Workers' Compensation Act and that, even if the claim is not

barred, Plaintiff's allegations do not rise to the level necessary to create liability for intentional

infliction of emotional distress.  As was the case with Doerpholz, the court rejects both arguments.

As discussed previously, the exclusivity provision of the Worker's Compensation Act does not bar an employee from suing a co-employee for intentional torts committed outside the scope of employment and unrelated to the interest of the employer.  *Anzalone*, 526 N.E.2d at 249 (citing *O'Connell v. Chasdi*, 511 N.E.2d 349, 351 (Mass. 1987)).  *See also Brown*, 696 N.E.2d at 956-57.  The court concludes that Plaintiff has sufficiently alleged a pattern of workplace bullying by Orr that could be considered outside the scope of his employment and unrelated to SHELD's interests.  "At this early stage of the proceeding, it [would be] premature to say that [Plaintiff], after conducting discovery, will be unable to prove any set of facts demonstrating that [Orr] was acting neither within the course of his employment nor in furtherance of his employer's interest."  *Id*. at 957 (citing *Catalano v. First Essex Sav. Bank*, 639 N.E.2d 1113, 1117 (Mass. App. Ct. 1994)).  Therefore, dismissal based on the exclusivity provision of the Worker's Compensation statute is inappropriate.

Moreover, at this stage of the litigation, Plaintiff has sufficiently stated a claim for intentional infliction of emotional distress, even if barely so.  Plaintiff claims to have suffered serious emotional harm as a result of Orr's misconduct beginning with the December 13, 2013 incident, which caused Plaintiff such significant anxiety that he was out of work for a period of months.  Plaintiff alleges that Orr's mistreatment of him continued after Plaintiff returned to work, by which point Orr was aware of Plaintiff's anxiety, yet Orr continued to exhibit hostility toward Plaintiff in an intimidating fashion on numerous occasions.  *See Thomas*, 134 F. Supp. 3d at 651 (denying the defendants' motion to dismiss an IIED claim where the plaintiff alleged that

the defendants engaged in a prolonged plan to force the plaintiff out of his job, which, while

"barely sufficient" to state a claim, merited further development of the record).

     D.  <u>The Light Board's Motion to Dismiss</u>

     The Light Board has moved to dismiss Plaintiff's claim against it for negligent

supervision, training, and retention of defendants Orr and Doerpholz on the ground that it is

barred by the exclusivity provision of the Workers' Compensation Act, which provides that "[a]n

employee shall be held to have waived his right of action at common law … in respect to an

injury that is compensable under this chapter, to recover damages for personal injuries, if he shall

not have given his employer, at the time of his contract for hire, written notice that he claimed

such right …."  Mass. Gen. Laws ch. 152, § 24.  *See also Green v. Wyman Gordon Co.*, 664

N.E.2d 808, 813 (1996) ("Common law actions are barred by the exclusivity provision of the

workers' compensation act where: 'the plaintiff is shown to be an employee; his condition is

shown to be a 'personal injury' within the meaning of the [workers'] compensation act; and the

injury is shown to have arisen 'out of and in the course of … employment.'" (alterations in

original) (quoting *Foley v. Polaroid Corp.*, 413 N.E.2d 711, 713-14 (1980)).  According to the

Light Board, because Plaintiff's factual allegations establish that Plaintiff was injured at work

and that his injuries resulted in a workers' compensation claim, Plaintiff can prove no set of facts

entitling him to relief on his common law claim for negligence due to the operation of the

exclusivity provision.  Plaintiff counters that his negligence claim is not a common law claim,

but rather a statutory claim brought against the Light Board, a public employer, pursuant to the

Massachusetts Tort Claims Act ("MTCA").  *See* Mass. Gen. Laws ch. 258, § 2 (providing that

"[p]ublic employers shall be liable for injury or loss of property or personal injury or death

caused by the negligent or wrongful act or omission of any public employee while acting within

the scope of his office or employment, in the same manner and to the same extent as a private individual under like circumstances").  According to Plaintiff, because his claim is a statutory claim, the exclusivity provision does not apply.

Plaintiff's attempt to cast his negligence claim as a statutory claim is unavailing.  The MTCA did not transform common law causes of action for negligence brought by a public employee against the Commonwealth or public employers into statutory claims.  Rather, the MTCA abolished the judicially created common law concept of sovereign immunity in tort actions (with its many piecemeal exceptions), and replaced it with "a comprehensive and uniform regime of tort liability for public employers."  *Morrissey v. New England Deaconess Ass'n – Abundant Life Cmtys., Inc.*, 940 N.E.2d 391, 397-399 (Mass. 2010).  Stated another way, the MTCA does not operate to make Plaintiff's negligence claim against the Light Board a statutory claim.  Rather, it allows Plaintiff to bring his common law claim for negligence against the Light Board because, through the MTCA, the Commonwealth waived sovereign immunity. *See id.* at 402.

Thus, Plaintiff's status as a public employee suing a municipal employer does not alter the analysis, and the Light Board is correct.  Because Plaintiff did not expressly reserve his common law rights of action, his claim of negligence against the Light Board for injuries that arose out of and in the course of his employment is barred by the exclusivity provision of the Workers' Compensation Act.  The Supreme Judicial Court recognized as much when it noted in *Foley v. Boston Housing Auth.*, 555 N.E.2d 234 (Mass. 1990), that the Act's exclusivity provision barred an employee of a municipal housing authority from bringing a claim for recovery in the tort action brought by his spouse and children against the housing authority for loss of consortium because he received workers' compensation benefits as a result of his injury.

44

*Id.* at 235 n.3 (Mass. 1990). *See also Perkins v. Mass.*, 752 N.E.2d 761, 763-64 (Mass. App. Ct.

2001) (stating, in the context of a lawsuit brought by a former cadet at the State Police Academy

against three agencies of the Commonwealth and three employees of the Academy, that "[t]he

plaintiff recognizes that under G.L. c. 152, § 24, unless an employee expressly preserves his or

her common law rights of action, a claim alleging negligence of an employer or of a coemployee

is foreclosed by the exclusivity provisions of the workers' compensation act") (footnote omitted)

(citing *Foley*, 555 N.E.2d at 235 n.3)).

IV.   Conclusion

   For these reasons, it is this court's RECOMMENDATION that Doerpholz's motion be

DENIED; that Orr's motion be GRANTED with respect to Plaintiff's claims under the MCRA

and § 1983, but DENIED with respect to Plaintiff's claim for intentional infliction of emotional

distress; and that the Light Board's motion be GRANTED.[7]

                                              /s/ Katherine A. Robertson
                                              KATHERINE A. ROBERTSON
                                              United States Magistrate Judge
DATED:  August 22, 2016

---

[7] The parties are advised that under the provisions of Fed. R. Civ. P. 72(b) or Fed. R. Crim. P.
59(b), any party who objects to these findings and recommendations must file a written objection
with the Clerk of this Court within fourteen (14) days of the party's receipt of this Report and
Recommendation.  The written objection must specifically identify the portion of the proposed
findings or recommendations to which objection is made and the basis for such objection.  The
parties are further advised that failure to comply with this rule shall preclude further appellate
review by the Court of Appeals of the District Court order entered pursuant to this Report and
Recommendation. *See Keating v. Sec'y of Health & Human Servs.*, 848 F.2d 271, 275 (1st Cir.
1988); *United States v. Valencia-Copete*, 792 F.2d 4, 6 (1st Cir. 1986); *Scott v. Schweiker*, 702
F.2d 13, 14 (1st Cir. 1983); *United States v. Vega*, 678 F.2d 376, 378-79 (1st Cir. 1982); *Park
Motor Mart, Inc. v. Ford Motor Co.*, 616 F.2d 603, 604 (1st Cir. 1980).  *See also Thomas v. Arn*,
474 U.S. 140, 154-55 (1985).  A party may respond to another party's objections within fourteen
(14) days after being served with a copy thereof.